## ZELLER MARINE CORPORATION v. NESSA CORPORATION.
### No. 103, Docket 20786.

Circuit Court of Appeals, Second Circuit.
Feb. 11, 1948.

L. HAND, Circuit Judge, dissenting.

———◆———

Before L. HAND, SWAN and AUGUSTUS N. HAND, Circuit Judges.

Purdy & Lamb, of New York City (Edmund F. Lamb, of New York City, of counsel), for Zeller Marine Corporation, libellant-appellant.

Bigham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for Nessa Corporation, respondent-appellee.

AUGUSTUS N. HAND, Circuit Judge.

The libellant, Zeller Marine Corporation, as managing owner of the scow "Zeller No. 12," brought this suit in admiralty to recover damages sustained by the scow on November 20, 1941, through the negligence of the respondent, Nessa Corporation, a stevedoring company, in allowing a draft of steel girders, that was being unloaded from the scow by a sling, to fall from the sling, penetrate the deck of the scow and strike against the top of one of the fore and aft keelsons in the bottom of the hold. The keelson was made of long leaf yellow

pine lumber about 39 feet in length and 12 inches square.

The damage caused by the striking of the end of the girder against the top of the keelson consisted of a V-shaped depression on the top of the keelson, the legs of which were about 3 inches long. The fibres of the wood within the area of this V-shaped depression were crushed to a depth varying—according to the estimates of different witnesses—between $\frac{1}{2}$ inch and $1\frac{1}{2}$ inches at the point of maximum depth. A split was found on the top of the keelson about 2 inches from the port edge which ran forward toward the bow of the scow for a distance of about 28 or 29 inches. At its forward end this split was about 3 inches in from the port edge of the keelson. A second split was found on the side of the keelson beginning at a point about 2 inches down from the top of the keelson and running forward a distance of about 20 inches where it ended about 4 inches down from the top of the keelson. According to libellant's witness, Swenson, although there were two separate splits showing, one on the top and one on the side of the keelson, they were in fact a single split starting at the top and finishing at the side of the keelson. There was a very slight bulge at the side of the keelson at the point of the split which was not more than $\frac{1}{16}$ of an inch out of line. The width of the split was so fine that the edge of a screw driver only $\frac{1}{32}$ of an inch wide at its edge and $\frac{1}{16}$ of an inch at its thickest part could not be inserted in the split. Libellant's witness, Swenson, evidently using a thinner probe, said that at one point he reached a depth of 6 inches. The greatest length of either split was the 28 or 29 inch length of the top split which was only about 6 per cent of the entire 39 foot length of the keelson. The total extent of the damaged area was less than 168 cubic inches out of 61,400 cubic inches, representing the cubic area of the entire keelson.

A libel and answer were filed and on February 3, 1943, an interlocutory decree was entered on consent in favor of the libellant for 90 per cent of libellant's provable damages without interest or costs up to the date of the interlocutory decree.

Hearings were thereafter had before a Commissioner who reported that the libellant was entitled to have the damaged keelson removed and replaced at an estimated cost of $6,550 and, because of the stipulation limiting recovery to 90 per cent of the latter sum, found that the recovery should be thus computed. Judge Rifkind, before whom exceptions to the Commissioner's report were argued, found that the scow could be restored to as good a condition as it was in before the accident by renewing three damaged deck planks at an expense of $138, and repairing the damaged keelson at a cost of $580. He accordingly gave a decree to the libellant for 90 per cent of this amount, or $646.20, plus an additional sum representing interest and costs making a total of $793.46.

Upon a motion by the respondent to eliminate costs of the libellant the decree was resettled so as to award the sum of $782.46 to the latter. From the decree as thus resettled the libellant has appealed. In our opinion this decree was right and should be affirmed.

It was stipulated by the parties on April 14, 1944 that no repairs had been made to the keelson since the time of the accident and that for a period of about two and one-half years the vessel had continued to engage in the same type of diversified lighterage as before. This in itself is persuasive evidence that the injury to the scow was not such as to justify replacement of the keelson and the attendant expense of renewing at least 37 out of 96 bottom planks at the cost for which the Commissioner allowed recovery. As Judge Addison Brown held—when dealing with a somewhat parallel situation—in the J. T. Easton, D.C., 24 F. 95, 96: "An owner whose boat is damaged by the negligence of another is entitled to have his boat repaired in a way which will not leave her essentially depreciated in her market value, or inferior for practical use. But where an injury can be perfectly repaired for all practical uses at slight expense, but, as in this case, cannot be placed in exactly the same condition as new, except by taking out and replacing much other good work at a very considerable expense, the court must hesitate in allowing damages on

the basis of the latter mode of repair, especially where, as in this case, though a long time has elapsed, no such repair has been made. The court could only be warranted in allowing for new beams upon very plain and certain proof that the market value of the boat will otherwise be materially and certainly lessened."

This opinion of Judge Brown, as might well be expected, states the proper rule of law for the recovery of damages by an owner whose vessel has been injured, and we find nothing in The Baltimore, 75 U.S. 377, 19 L.Ed. 463, which should be interpreted to the contrary. Any award must be calculated with recognition of the customary obligation of the injured party to minimize damages. In other words, he is only entitled to an award that would give him a boat as seaworthy and practically serviceable as before and not to an award, often much larger, sufficient to restore her to the identical condition she was in before the injury.

■ The general effect of the authorities has been a denial of damages based upon replacement of an injured portion of a vessel in cases where repairs made at a substantially lower cost would render her as serviceable as before. Streckfus Steamboat Line v. United States, 5 Cir., 27 F.2d 251, 252; The Loch Trool, D.C.N.D.Cal., 150 F. 429, 431; Socony No. 21, D.C.S.D. N.Y., 1934 A.M.C. 136.

■ The cases relied upon by the libellant for allowing the cost of replacement of the damaged portion of a vessel hold that the repair method rejected by the courts was only "temporary," or did not put the vessel in "as good" a condition as before. Such authorities were satisfactorily distinguished by the trial judge. In his opinion he made the following observations as to the issues raised by the libellant and respondent at the hearing before the Commissioner: "During the hearing the libellant took the position, which was sustained by the special commissioner, that under the rule of restitutio in integrum, the libellant was entitled to have the scow put back to its original condition, irrespective of the cost of removing and renewing the damaged keelson. It was the conten-

tion of the respondent that, where the cost of renewal was disproportionate to the cost of repairing the damage and putting the scow into as good a condition as it was before the injury, libellant was only entitled to the reasonable cost of such repair, together with the depreciation, if any, of the scow which had been damaged and repaired. Upon these two different theories each of the parties to the controversy proceeded in the presentation of evidence."

As a result of his analysis he held that libellant was only entitled to recover the estimated cost of repairs sufficient to render the vessel as seaworthy and serviceable as before the damage occurred and sustained exceptions to the Commissioner's report upon the theory that the latter had adopted libellant's contention that it was "entitled to have the scow put back to its original condition, irrespective of the cost of removing and renewing the damaged keelson." In other words, he did not disregard Admiralty Rule 43½, 28 U.S.C.A. following section 723, requiring him to treat the report of the Commissioner as correct unless he was satisfied that error of law had been committed. He reversed the Commissioner only because the latter had made his report upon the theory that the libellant was entitled to recover the cost of restoring the damaged scow to the identical condition she was in before the accident, irrespective of other methods of repair that would make her equally serviceable. He allowed only the cost of replacing three deck planks and repairs to the keelson which he found sufficient to render the vessel seaworthy and serviceable and upon the testimony which he credited properly denied any allowance for depreciation upon the authority of Sawyer v. Oakman, C.C., 7 Blatch. 290, and Loch Trool, D.C.N.D.Cal., 150 Fed. 429, 433.

In estimating the damages upon the basis of the cost of repairing the keelson without replacing it, the district judge followed the testimony of the respondent's witness Horn who furnished the only evidence as to such cost. This was justified if the Commissioner, as the judge thought, had made no finding that only replacement of the keelson would render the boat as seaworthy and serviceable. The question is

whether the Commissioner found that replacement was necessary to accomplish that result. We think that the Commissioner's report, taken in connection with what transpired at the hearing before him, shows that he made no such finding but instead adopted the erroneous theory that the libellant was entitled to have its boat restored to the condition she was in before the accident irrespective of whether a far less expensive mode of repair would render her as useful for all practical purposes.

This was the theory advanced by the libellant at the hearing in questioning its witnesses Swenson, Sandos, and Bagger. When the respondent attempted to introduce evidence as to methods of repair other than replacement the libellant objected on the ground that the owner was "entitled to have his property restored to the condition it was in prior to the accident." In connection with the discussion of the admissibility of that type of evidence, the Commissioner said (folio 92): "He is entitled to have it put in its original condition; there is no question about that * * * Restitutio in integrum * * *." Testimony as to other types of repair seems only to have been allowed because the Commissioner did not wish to exclude anything which the court might later think should have been admitted. (Folios 93, 236.) He made no allusion in his report to methods of repair other than replacement and merely said that respondent's experts stated "that in their opinion the driving of a few nails would cure the trouble. I do not agree with this." But the respondent had shown by its witness Horn that repairs of the keelson would render the boat completely serviceable at a cost which Judge Rifkind adopted. On cross examination, libellant's witness Swenson admitted that other methods of repair would restore the boat to a seaworthy con-

dition (folio 96) while libellant's witness Bagger not only advocated removal of the keelson but stated on cross examination that it was the only proper way to repair this damage (folio 429). Though this vital question was raised by the respondent the Commissioner failed to make any finding that replacement of the keelson was necessary in order to restore the boat to as seaworthy a condition as before. Instead he adopted libellant's erroneous theory of damages, as presented by its witnesses. In further support of our view, it may be added that libellant contended, at least until the filing of its reply brief, that if there were any damage requiring any repair of the keelson it was entitled to a replacement without consideration of any other method.

■ The Commissioner having made no findings upon a proper rule of damages, we are not precluded by Admiralty Rule 43½ from affirming the findings of fact and conclusions of law of the district judge, supported as they were by substantial evidence.

Decree affirmed.

L. HAND, Circuit Judge (dissenting).

I think that, on the record as it stands, the judge was wrong in reversing the Commissioner. I agree with my brothers' statement of the law; the owner of a vessel wrongfully injured has no unconditional right to have her restored to the same condition in which she was before: the phrase, "restitutio in integrum," is one of those scraps of Latin which serve only to bemuse the user and usually the hearer. My brothers' quotation from Judge Brown's opinion in The J. T. Easton [1] I accept in full; but, although the Commissioner did not grasp it, I am disposed to read his finding—the whole of which I quote in the margin [2]—as meeting Judge

---

[1] 24 F. 95, 96.

[2] "In addition to these two witnesses, the libellant produced Mr. Bagger, a marine surveyor and also a naval architect. He agrees that the injured keelson should be renewed according to libellant's survey. He estimates that the keelson has been weakened to the extent of 33 per cent, and explains the injurious

effect of the blow of the falling steel beam upon the fibers of the wooden keelson. I am impressed by his testimony.

"The respondent's experts, on the other hand, minimize this injury, stating that in their opinion the driving of a few nails would cure the trouble. I do not agree with this.

"It is generally admitted by all wit-

Brown's rule. He apparently accepted the testimony of Bagger, who, unless I am wrong, meant to say that the scow would remain "inferior for practical use" unless the full amount was spent on her. I submit that this is the inevitable consequence of the following answer: "Now in your opinion, Mr. Bagger, was the effective strength of the keelson impaired by the damage sufficiently to require renewal of the keelson, or not? It was." If I were forced to decide upon this record, in spite of the Commissioner's error of law I think that I should affirm his award because of his finding, which was certainly not "clearly erroneous." However, I should greatly regret being forced to do this because his meaning is certainly not clear; and we are not forced to such a course. We can send the report back to him and ask him to answer categorically how much money it was necessary to spend on the scow so as not to "leave her essentially depreciated in her market value, or inferior in practical use." That is what I think we should do.

nesses that the market value of the vessel has been lowered.

"The owner has the right in law to keep his vessel unrepaired and sue for damages, if he so desires. It is his privilege and not that of the tort feasor.

"I accept the estimate of the cost of repairs made by the Dry Dock Company in the sum of $6,550. The rule of restitutio in integrum applies, and that rule requires my acceptance of the libellant's survey and its estimate of repairs."